699 So.2d 258 (1997)
Tom NELSON and Maria Nelson, Appellants,
v.
Helen K. WIGGS, Appellee.
No. 96-3328.
District Court of Appeal of Florida, Third District.
August 13, 1997.
Rehearing Denied October 8, 1997.
*259 Robert S. Glazier, Miami, for appellants.
Ludovici & Ludovici and Michelle C. Fraga, Miami, for appellee.
Before FLETCHER, SHEVIN and SORONDO, JJ.
FLETCHER, Judge.
Tom Nelson and Maria Nelson appeal a final judgment following a bench trial, which judgment denied their complaint for rescission of their purchase of a house from appellee Helen K. Wiggs. We affirm.
Subsequent to the destruction of their home by Hurricane Andrew in 1992, the Nelsons, who had lived in South Dade County for ten years, began a search for a "fixer upper" house that they could afford. They found Mrs. Wiggs' house by noticing a "For Sale By Owner" sign out front. Mrs. Wiggs, who had resided on the property since 1970, was selling, according to her testimony, because she needed to relocate close to public transportation, having recently been widowed and being unable to drive a car.
The house, accessed only by an unpaved road, is situated on an acre and a quarter of land in the eight and one-half square mile agricultural/residential area known as the East Everglades. This area lies west of the flood control levee, which levee affords most of the flood protection for that part of Dade County east of it. During the rainy season the East Everglades area is often flooded, the water varying in depth from ankle to knee deep. The testimony reveals that small vehicles cannot enter the area during heavier flooding, thus many residents have trucks and other large vehicles. The Nelsons testified that they cannot grow the plants that they wish and that, during the flooding, snakes and even alligators (two at least), have gathered at their property (presumably on an elevated portion) to escape the waters. The house itself, however, like some of the other houses, farm buildings, and structures in the East Everglades area, was constructed at raised elevation, thus assuring that the seasonal flood waters do not enter the house.[1] As a consequence, the house has not been flooded and has been continuously occupied, by the Nelsons since their purchase from Mrs. Wiggs and, before that, by Mrs. Wiggs since 1970.
The Nelsons testified that before they purchased Mrs. Wiggs' property, they did not have actual knowledge of the seasonal flooding that takes place in the East Everglades. They found the property, negotiated the sale, moved into the house, and closed on the sale *260 during the dry season.[2] They testified that it was not until later that they learned of the flooding, after which they filed their suit for rescission, alleging that Mrs. Wiggs knew of the flooding, but failed to disclose it to them, and that they would not have purchased the property had they been aware of the flooding. [R. 13-15]. Relying principally upon Johnson v. Davis, 480 So.2d 625 (Fla.1985),[3] they contended that prior to the purchase Mrs. Wiggs had the duty to advise them of the seasonal flooding.
In its final judgment, the trial court made the specific findings, thus resolving the somewhat conflicting testimony, that the Nelsons did not ask Mrs. Wiggs about flooding and that Mrs. Wiggs did not make any affirmative statements to the Nelsons regarding flooding. The trial court further found that the Nelsons requested no inspections of the property and did not talk to the neighbors about the flooding. The trial court also observed that the Nelsons had lived in the South Miami area for ten years before their purchase of property in the East Everglades. Based on these facts, the trial court concluded that Johnson v. Davis is inapplicable and denied rescission. We affirm the trial court's conclusion that Mrs. Wiggs had no duty to disclose the seasonal flooding as the information that the property is subject to seasonal flooding was available to the Nelsons through diligent attention.
In Johnson v. Davis, 480 So.2d at 629, the Supreme Court of Florida took a long look at caveat emptor, concluded that changes thereto needed to be made, and approved the salutary rule that:
"[W]here the seller of a house knows of facts materially affecting the value of the property which are not readily observable and are not known to the buyer, the seller is under a duty to disclose them to the buyer." [emphasis supplied]
Thus, in order for a seller to have a duty to disclose, the material facts must not only be unknown to the buyer, but also not "readily observable." The supreme court did not define these words. Our concern is whether the supreme court intended that a buyer must be able to discern the relevant facts by simple visual observation of the property, at any and all times, or whether it had a broader meaning in mind. We have concluded that the court's intended meaning is broader. In arriving at this conclusion we have considered that the supreme court, in Johnson, 480 So.2d at 628, cited and quoted with approval Lingsch v. Savage, 213 Cal.App.2d 729, 29 Cal.Rptr. 201 (1963):
"It is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer." [emphasis supplied]
The supreme court, Johnson, 480 So.2d at 629, concluded that this philosophy (and similar philosophies from additional jurisdictions) should be the law in Florida.
We have also considered Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So.2d 334 (Fla.1997), in which the Florida Supreme Court recently reaffirmed the principles of Johnson. While Gilchrist involved a negligent misrepresentation by the seller, and not inaction by the seller as here, the supreme court, immediately following its reaffirmance of Johnson, stated,
"This does not mean, however, that the recipient of an erroneous representation can hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error."
696 So.2d at 339.
Thus a buyer would be required to investigate any information furnished by the seller that a reasonable person in the buyer's position *261 would investigate. In Gilchrist the information required to be investigated was the zoning on the property, specifically as it related to the property's developability in accordance with the buyer's plans.
There are distinctions, of course, between cases which involve negligent misrepresentation (Gilchrist) and no representation at all (the instant case). The point is, however, that while reaffirming the principles of Johnson, the supreme court has informed us that, in both types of cases, a buyer must take reasonable steps to ascertain the material facts relating to the property and to discover themif, of course, they are reasonably ascertainable. As we understand from Gilchrist and Johnson, we need to analyze here whether the flood-prone nature of the property was known only to Mrs. Wiggs and whether, with diligent attention, the Nelsons could have learned of the property's nature (which is clearly material to their interests as buyers).
There is nothing concealed about South Florida's rainy season(s), nothing concealed about the fact that low-lying areas of the county flood during the rainy seasons, and nothing concealed about Dade County's regulations requiring that homes in such areas be built on elevations to avoid interior flooding. That Dade County enacted regulations to protect East Everglades homes from seasonal flooding clearly demonstrates that the flood-prone nature of the area is known to others as well as to Mrs. Wiggs. The regulations' enactment and availability in the public records also show that the information is within the diligent attention of any buyer.[4]
Specifically as to the Nelsons, we observe that Mr. Nelson is a contractor (air conditioning, heating and refrigeration) who, according to his testimony, "moved to Florida knowing they had the most stringent building code in the United States." [T.41]. Part of his interest in buying the subject property was to rebuild the house himself, in furtherance of which he visited the county building department and reviewed with county employees the original permits and plans for the house. [T.50-51]. Mr. Nelson also testified [T.53]:
"Q. During the time that you lived there prior to closing, did you have the opportunity to check with Dade County?
A. I didactually I pulled the permit." [emphasis supplied]
Immediately available from the building department, open to the Nelsons' diligent attention, were the flood criteria to which the county required the house to be built in order to protect it from the seasonal flooding. We conclude that the trial court correctly denied the Nelsons' rescission complaint as the flood-prone nature of the area was within the diligent attention of the Nelsons, thus Mrs. Wiggs had no duty to disclose it.
Affirmed.
SHEVIN, J., concurs.
SORONDO, J., dissents.
SORONDO, Judge (dissenting).
Because I believe that the majority reads the Supreme Court's decision in Johnson v. Davis, 480 So.2d 625 (Fla.1985), too narrowly, I respectfully dissent.
I begin by clarifying certain facts set forth in the majority opinion. It is true that the Nelsons lived in southern Dade County, specifically, in an area known as Cutler Ridge. This area is several miles north of the East Everglades area where the subject property is located. Prior to living in Cutler Ridge they lived in the City of South Miami, a municipality which is several miles north of Cutler Ridge and even further away from the property at issue. There is nothing in the record to suggest that these two areas suffer from the same flood problems as the East Everglades area or that the residents of these two areas are aware of these flooding problems. Regardless of whether residents of Cutler Ridge and/or South Miami are aware of the flooding problems of the East Everglades, it is absolutely clear that the *262 Nelsons were not. The trial judge concluded not only that they did not know but that had they known, they would not have purchased the property.[5]
The majority affirms the trial court's decision on the grounds that "Mrs. Wiggs had no duty to disclose the seasonal flooding as the information that the property is subject to seasonal flooding was available to the Nelsons through diligent attention." Maj. Op. at ____. I believe that the Supreme Court's decision in Johnson compels a different result.
In Johnson, the Court stated that:
Where the seller of a house knows of facts materially affecting the value of the property which are not readily observable and are not known to the buyer, the seller is under a duty to disclose them to the buyer.
Id. at 629. Based on the trial court's factual finding, there is no doubt that the Nelsons had no actual knowledge of the seasonal flooding that takes place in the East Everglades. Under the Johnson analysis the question then becomes whether the flooding problem was "readily observable" to the Nelsons.
The Nelsons testified that they first saw the property in January of 1993. They further testified that no flooding problems were apparent at that time. There is nothing in the record to suggest that the location of the flood control levee referred to by the majority was plainly identifiable or that the Nelsons ever saw it. The only mention in the record of the levee was by defense counsel and witness Bradley Waller, a hydrologist called by the Nelsons. As concerns the "readily observable" analysis, Mr. Waller testified as follows:
THE COURT: Assume that a person goes to this area, this particular location, this residence that you now have visited and identified while it is flooded.
THE WITNESS: Okay.
THE COURT: Not necessarily at the highest level in the hundred years, but just flooded in one of these three to four months, three to six months, is that something that a person would be able to readily observe?
THE WITNESS: You should be able to observe that. I mean, if it's flooded, it's flooded. Generally flooding occurs on a typical year, and I say typical because we've had some atypical dry and wet years. It generally occurs May, June at the beginning of the wet season; and September, October at the end of the wet season. Beginning and end of the wet season are usually your peaks.
THE COURT: Who keeps the records of this flooding stuff?
THE WITNESS: The South Florida Water Management District and the U.S. Geological Survey.
THE COURT: If a person, a prospective homeowner wanted to go and research this issue, are these public records?
THE WITNESS: These are public records. Maybe not published, but they're public records. They're paid for by taxpayers.
THE COURT: And can you tell me how readily available they are? Is this something that only someone with your expertise would know that they're kept?
THE WITNESS: Well, most people know that. You know, any insurance company would know about flood criteria. So to do the flood criteria, you'd have to have some type of data available. So it's not common knowledge for every body, but if you find the right people, the agencies that deal with it, it's pretty common, commonly known.

(Emphasis added). The testimony of this hydrologist clearly establishes that only people who see the flooding itself and "the right people" would be aware of the flooding problem.
In considering whether the problem was "readily observable" to the Nelsons it is also important to note that this sale was owner financed, no real estate professional was involved, *263 the Nelsons did not hire a lawyer, and, because the house on the property was a shell, they were unable to secure regular homeowners insurance. Consequently, every possible avenue through which the truth could normally have been discovered was unavailable to them. The record further establishes that although the Nelsons had been living in South Florida for approximately 13 years, they had never owned a home here. Before moving to Florida they lived in Texas where they purchased a parcel of land and built a cabin on it. These are obviously very simple people. This record does not establish that this significant problem with the property was "readily observable" during the beginning of the year, the "dry season," when the Nelsons made the purchase. Accordingly, Johnson required Mrs. Wiggs to reveal the significant flooding problem to potential buyers viewing the property during the "dry season." A review of Johnson can lead to no other conclusion.
The majority suggests that South Florida's rainy season, low-lying areas and house elevation requirements in such areas are common knowledge to everyone. This is not so. In 1982, Metropolitan Dade County passed an ordinance which requires sellers of real property within the "East Everglades area of critical environmental concern" to include a warning in the documents of sale. This warning must advise the potential purchaser that the "land is subject to periodic, natural flooding, which poses a serious risk to persons and property in the area and makes the property unsuitable for residential, commercial, and industrial development." DADE COUNTY CODE § 33B-54(a). The purchaser must sign the document and indicate that he or she understands the warning. If a seller fails to give the warning, the sale of property is voidable by the purchaser during the next seven years. DADE COUNTY CODE § 33B-56. Certain areas, including the area at issue here, for unknown reasons, were excluded from the ordinance. Nevertheless, the existence of the ordinance demonstrates the County's recognition that the flooding problem in this area is not commonly known, but rather is something which needs to be told to buyers.
The majority's reliance on Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So.2d 334 (Fla.1997), is misplaced. The facts of Gilchrist are distinguishable from those of this case. In Gilchrist the Gilchrist Timber Co. purchased a 22,641 acre tract of timberland from ITT Rayonier. ITT provided Gilchrist a one year-old appraisal of the property that listed the property as being zoned agricultural, which allowed residential usage. In reality, the vast majority of the property was zoned "preservation," which permits no residential use. The zoning prevented Gilchrist from cutting down the timber on the property and then selling the land for residential use. The issue presented to the Supreme Court involved ITT Rayonier's negligent misrepresentation and its liability for such a misrepresentation where Gilchrist relied upon the erroneous information despite the fact that an investigation by Gilchrist would have revealed the falsity of the information.
As acknowledged by the majority opinion, this is not the issue before this court here. The majority relies on Gilchrist for the dicta which it quotes at page 260 of its opinion. Unfortunately, the quote stops two sentences too short. The Supreme Court goes on to say:
Clearly, a recipient of information will not have to investigate every piece of information furnished; a recipient will only be responsible for investigating information that a reasonable person in the position of the recipient would be expected to investigate.
Id. at 339. In Gilchrist, the timber company was purchasing virgin land for purposes of exploiting its timber and then selling the land for residential development. Because the land was being purchased for investment purposes nothing could have been more important than the zoning restrictions on the property. In the present case the Nelsons were home shopping in an area that was clearly residential. The entire neighborhood was dry, and, for all intents and purposes, looked like an average residential area.
The majority notes that the trial court found that the Nelsons did not request "inspections" of the property and "did not talk to the neighbors about the flooding." I am *264 at a loss to understand what type of "inspections," beyond the customary termite and roof "inspections,"[6] the Nelsons could have reasonably been expected to conduct that would have resulted in the discovery of the flooding problem. As concerns the trial court's conclusion that the Nelsons did not speak to any neighbors about the flooding problem, I can only repeat that no such problem was readily observable and that it is unreasonable to expect that they would have conducted such an inquiry. Moreover, I am not prepared to conclude that a purchaser of residential property is obligated to canvass potential neighbors to determine whether there are any "unseen" problems with the neighborhood. There is nothing in this record that suggests that the Nelsons had any reason to investigate anything.
A review of the facts and holding of Johnson is helpful. There, the plaintiff inquired of the seller why there was some peeling plaster around a window frame in the family room and stains on the ceilings in the family room and kitchen. The seller responded that the window had a minor problem that had long since been resolved. After purchasing the house, the buyer returned home during a heavy rain to find water "gushing" in through the window in question. The buyers sought rescission of the contract of sale and a return of their money. In analyzing the issues before it, the Florida Supreme Court stated:
[W]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous. Both proceed from the same motives and are attended with the same consequences; both are violative of the principles of fair dealing and good faith; both are calculated to produce the same result; and, in fact, both essentially have the same effect.
Id. at 628. The Court went on to discuss the then-existing legal concept in Florida that there was no duty to disclose when parties are dealing at arm's length.
These unappetizing cases are not in tune with the times and do not conform with current notions of justice, equity and fair dealing. One should not be able to stand behind the impervious shield of caveat emptor and take advantage of another's ignorance.... Modern concepts of justice and fair dealing have given our courts the opportunity and latitude to change legal precepts in order to conform to society's needs. Thus, the tendency of the more recent cases has been to restrict rather than extend the doctrine of caveat emptor. The law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it.

Id. at 628 (emphasis added). Given this language, it is inconceivable that Johnson does not apply to this case. Although the flooding in the area is a natural occurrence, rather than a "defect" in the property, unlike other natural phenomena such as hurricanes, tornadoes and earthquakes, it is chronic and fully predictable.
As mentioned by the majority, the Nelsons called three neighbors to the witness stand who described the accumulated water during the rainy season as being ankle to knee deep. Many of the people in the neighborhood are forced to drive trucks and other "high" vehicles because smaller vehicles cannot enter the area when it is flooded. During the flooding, the Nelsons' animals must congregate around the house, which is the only dry location on the property. The animals must also relieve themselves in the immediate area surrounding the house because they will not go in the water to do this. Finally, the Nelsons testified that other animals, not their own, gather next to the house in an apparent effort to escape the water. As described by one of the neighbors, the property is unlivable.
The majority opinion paints Mrs. Wiggs' conduct in this case in a far too positive light. When the Nelsons first spoke to Mrs. Wiggs *265 they told her they wanted the property because they wanted to plant trees and raise animals.[7] She responded that there were no limitations and that they could do anything they wished on the property. She never mentioned the flooding which would clearly affect the Nelsons' stated plans for the property. The Nelsons further asked her if there were any problems with the property and she responded that the only problem was with the neighbors.
The Supreme Court's decision in Johnson, and the many out-of-state cases cited therein, stand for the proposition that the law encompasses a moral dimension in these types of transactions. This dimension requires full disclosure of facts materially affecting the value of the property in question, which are not readily observable by the average person seeking to buy the property and which are not known by them. This concept is encapsulated in the following language from a respected treatise:
[T]here has been a rather amorphous tendency on the part of most courts in recent years to find a duty of disclosure when the circumstances are such that the failure to disclose something would violate a standard requiring conformity to what the ordinary ethical person would have disclosed.
W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW TORTS § 106 (5th ed. 1984). During the presentation of their case in chief the Nelsons called witness Elizabeth Wilson, a neighbor and realtor associate. Ms. Wilson was asked whether the flooding condition described above materially affects the value of the property. She testified that it did. On cross-examination Ms. Wilson testified that it was impossible to establish an exact value for the Nelson property because there were no "comparables" from which to make a judgment. On re-direct examination she explained that this is so because there are no sales in the area. She added that if she could get half of what her own house is worth she would sell it. Her examination concluded as follows:
Q. Do you know whether people normally tell their prospective buyer about the flooding problems in that area?
A. I do. I live in the area and I cannot sell there.
Q. Okay. You weren't able to sell, so more likely you sell if you're selling in the dry time of the year and you don't tell your prospective buyer about the flooding?
A. I wouldn't do that.
Ms. Wilson's testimony illustrates the magnitude of the problem Mrs. Wiggs was facing when she decided to sell her property. Unlike Ms. Wilson, Mrs. Wiggs decided that the price of honesty was too great and that the buyer should beware. In light of the Supreme Court's comments concerning the ever shrinking doctrine of caveat emptor, I am convinced that "elementary fair conduct" demanded full disclosure in this case. Consequently, I conclude that Mrs. Wiggs had an affirmative duty to advise the Nelsons of the enormous flooding problem in the area.
The majority's decision affirming the trial court's ruling grants no relief to the Nelsons. It is obvious that the Nelsons cannot continue to live on this property as it is, by all accounts, unlivable. Having failed to obtain relief from the courts, no doubt their solution will be to wait for the dry season and post the same "For Sale by Owner" sign Mrs. Wiggs posted. They will then have to wait for a another naive buyer to come along. When that buyer comes along they will do unto him or her as was done unto them, and the vicious cycle of fraud by silence will continue.
I would reverse and grant rescission of the contract.
NOTES
[1] The Dade County flood criteria elevations require the roads in the area to be above the ten-year statistical flood level and the house "pads" (elevated sites) to be above the hundred-year statistical flood level, according to the Nelsons' expert witness, a hydrologist. Presumably any houses that are not elevated were constructed before the enactment of the flood criteria regulations.
[2] With Mrs. Wiggs' permission, the Nelsons resided in the house for a month prior to the closing.
[3] Approving this court's decision in Johnson v. Davis, 449 So.2d 344 (Fla. 3d DCA 1984).
[4] Owners of real property are deemed to have purchased it with knowledge of the applicable land use regulations. Metropolitan Dade County v. Fontainebleau Gas & Wash., Inc., 570 So.2d 1006 (Fla. 3d DCA 1990). We discern no reason why the County's flood criteria would not be included within this rule.
[5] In an apparent effort to curtail cumulative testimony, the trial judge interrupted the testimony of Ms. Nelson and said to her: "It is clear to me that you, right now, have a situation that if you had known about it you would not have bought the house." Immediately after the court made this assurance the examination of Ms. Nelson ended and the witness was excused.
[6] I am compelled to observe that because the house on the property was only a "shell" being purchased in an "as is" condition, the Nelsons had no reason to conduct even these, customary inspections.
[7] Ms. Nelson testified that they own 42 animals.